**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**NORTHERN DIVISION**

| | |
|---|---|
| **JOHN RYMAN**, <br> 704 River Rock Way #101 <br> Newport News, VA  23608 <br><br> **BOBBY and THELMA THOMAS**, <br> 1517 Oakridge Road <br> Baltimore, MD 21218 <br><br> **KIMBERLY THOMAS** <br> 9503 Westphalia Road <br> Upper Marlboro, MD 20774 <br><br> Plaintiffs, <br><br> v. <br><br> **FIRST MORTGAGE CORPORATION** <br> <u>**Serve On:**</u> <br> James Perna <br> 38180 Saddle Lane <br> Clinton Township, MI  48036 <br><br> **HEALTH ONE CREDIT UNION** <br> <u>**Serve On:**</u> <br> New England Federal Credit Union <br> John J. Dwyer, Jr. <br> President and Registered Agent <br> 141 Harvest Lane <br> Williston, VT 05495 <br><br> -and- <br><br> **NEW ENGLAND FEDERAL CREDIT** <br> **UNION**; <br> <u>**Serve On:**</u> <br> John J. Dwyer, Jr. <br> President and Registered Agent <br> 141 Harvest Lane <br> Williston, VT 05495 <br><br> Defendants. | Civil Action No.: _____ |

1

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs John Ryman, Bobby and Thelma Thomas, and Kimberly Thomas on behalf of themselves and on behalf of the entire class of persons similarly situated, by and through their attorneys, Michael Paul Smith, Melissa L. English and Sarah A. Zadrozny of Smith, Gildea & Schmidt, LLC and Timothy F. Maloney, Veronica B. Nannis and Megan Benevento of Joseph, Greenwald and Laake, PA as co-counsel hereby file this Class Action Complaint and states as follows:

## INTRODUCTION

1.      Plaintiffs are borrowers who currently have or had a federally related mortgage loan, as defined by 12 U.S.C. § 2602, originated and/or brokered by Defendant First Mortgage Corporation ("FMC") which was or is secured by each Plaintiffs' residential real property.  For the purposes of procuring title insurance and to facilitate the escrow and settlement process, Plaintiffs used Genuine Title, LLC as a result of FMC's referral thereto.

2.      Plaintiffs and Class Members were victims of an illegal kickback scheme whereby FMC branch managers, loan officers, agents and/or other employees received unearned fees and kickbacks paid by Genuine Title, LLC, in violation of the Real Estate Settlement Procedures Act, 12 U.S.C. § 2601, *et seq.* ("RESPA"). These kickbacks were paid pursuant to a quid pro quo agreement for kickbacks in exchange for the referrals of FMC borrowers.  Neither FMC nor any of its employees and/or agents receiving the kickbacks performed any title or settlement services associated with the kickbacks.

3.      These kickbacks were fraudulently concealed by FMC and Genuine Title from Plaintiffs and Class Members and were omitted from Plaintiffs' and Class Members' HUD-1s and

other required loan documents in an effort to hide the kickbacks from Plaintiffs and Class Members.

4.      Defendant Health One Credit Union ("Health One") was the parent and alter ego of FMC, which it incorporated for the primary purpose of allowing Health One to profit from brokering and selling residential mortgage loans and refinances that Health One was not otherwise permitted to engage in under Michigan and federal law.   Health One controlled and dominated FMC's operations, policies and procedures during the time period of the Kickback Scheme and profited from the same loans on which FMC brokers and loan origination branch managers received and accepted kickbacks.

5.      Defendant New England Federal Credit Union ("New England Federal") acquired Health One in deal brokered by the National Credit Union Administration ("NCUA") that constituted a de facto merger. New England Federal continues to operate Health One in the same form and at the same locations, and holds these operations out to the public as the continuation of Health One.  New England Federal is the successor to the obligations and liabilities of Health One, including those arising from Health One's domination and control of FMC and the RESPA claims alleged herein.

## PARTIES

6.      Plaintiffs bring this action pursuant to Fed. R. Civ. P. 23 as a class action on their own behalf and on behalf of the entire class of people similarly situated.

7.      Plaintiff John Ryman is a resident and citizen of Newport News, Warwick County, Virginia.

8.      Plaintiffs Bobby and Thelma Thomas are residents and citizens of Baltimore, Maryland.

9.      Plaintiff Kimberly Thomas is a resident and citizen of Upper Marlboro, Prince George's County, Maryland.

10.     Defendant First Mortgage Corporation ("FMC") was at all relevant times a foreign corporation headquartered in Michigan and qualified as a foreign corporation doing business in Maryland. **Exhibit 1,** FMC Md. For. Corp. Qualification.   At all relevant times FMC was engaged in the business of consumer mortgage lending in Maryland and elsewhere.   FMC currently holds itself out to the public as a "division" of Defendant Health One Credit Union, and claims on its website to be a licensed mortgage lender in Maryland. *See* http://www.firstmortgagecorpusa.com/AboutUS.aspx.

11.     Defendant Health One Credit Union ("Health One") is a division of New England Federal. At all relevant times, Health One was a Michigan chartered, federally insured credit union, and the sole stockholder and alter ego of FMC. In December, 2014, Health One was acquired through receivership and liquidation by New England Federal and now holds itself out as a "division" of New England Federal and cites the entire beginning and history of Health One. *See* https://www.healthonecu.com/healthone.html.

12.     Defendant New England Federal Credit Union ("New England Federal") is a federally chartered credit union with its headquarters and principal place of business in Williston, Chittenden County, Vermont.   New England Federal is the successor in interest to Health One and FMC.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.

14.     This Court has personal jurisdiction over the parties.  This Court has personal jurisdiction over FMC because at all relevant times and based upon representations made on FMC's website, currently transacts business in Maryland.

15.     Personal jurisdiction over Health One is appropriate because it was at all relevant times the alter ego of FMC and under the law of this forum this Court may pierce the corporate veil for the purposes of exercising personal jurisdiction over Health One. *Newport News Holding Corp. v. Virtual City Vision, Inc.,* 650 F.3d 423, 433-34 (4th Cir. 2011).

16.     Personal jurisdiction over New England Federal is appropriate because it is the successor to Health One and FMC and under the law of this forum the Court may exercise personal jurisdiction over New England Federal as the successor of FMC and Health One. *Richmond v. Madison Mgt. Group, Inc.*, 918 F.2d 438, 453 (4th Cir. 1990).

17.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1)-(2) and (c)(2) because FMC is subject to this Court's personal jurisdiction, a substantial part of the conduct, events and omissions giving rise to the claims occurred within this District, and FMC systematically and continually transacted business in this District during the applicable time period.

**FACTUAL ALLEGATIONS FOR INDIVIDUAL AND CLASS RELIEF**

18.     Congress enacted RESPA in 1974 as a response to the abuses in the real estate settlement process. Congress found that kickbacks and unearned fees in the settlement process resulted in unnecessarily high settlement charges and other harms to residential mortgage borrowers.

19.     12 U.S.C. § 2607 states in relevant part:

        (a) Business Referrals. No person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any

agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person.

(b) Splitting charges. No person shall give and no person shall accept any portion, split or percentage of any charge made or received for the rendering of a real estate settlement service in connection with a transaction involving federally related mortgage loan other than for services actually performed.

20.     12 U.S.C. § 2607(d)(2) states in relevant part:

Any person or persons who violate the prohibitions or limitations of [12 USC § 2607] shall be jointly and severally liable to the person or persons charged for the settlement service involved in the violation in an amount equal to three times the amount of any charge paid for such settlement service.

21.     The purpose of 12 U.S.C. § 2607 is to eliminate payment of unearned fees in connection with settlement services provided in federally related mortgage transactions, to protect consumers from unnecessarily high settlement charges caused by certain abusive practices, and to protect against other harms to consumers resulting from coordinated business relationships for settlement services. *See* 12 U.S.C. § 2601.

22.     Genuine Title was at all times relevant hereto a title services company licensed under the laws of various states, including Maryland, and regulated by the Maryland Insurance Commissioner and had its principal place of business in the state of Maryland.

23.     At all relevant times, FMC's employees and/or agents were licensed mortgage brokers and/or authorized loan officers (collectively referred to herein as "Referring Brokers"). At all relevant times, the Referring Brokers were acting within the scope of the business relationship and duties of their employment on behalf of FMC, specifically: seeking borrowers ("FMC Borrowers"), securing loans for residential mortgages through FMC and/or brokering such loans through FMC to other lenders authorized by FMC, referring

FMC Borrowers to title companies, and working with title companies to close these loans.  All activities, including the Referring Brokers' interaction with Genuine Title, were for the benefit of FMC and its parent and alter ego, Health One.

**The Kickback Scheme**

24.     Beginning in 2009, and continuing until or about early 2014, Genuine Title perpetrated the Kickback Scheme by adopting a business model and practice of paying kickbacks to mortgage lenders and brokers (including FMC) for the referral of mortgage loans for settlement services ("Referral Agreement").

25.     Genuine Title paid kickbacks in four forms: 1) "Referring Cash", 2) "Free Marketing Materials" (including postage, leads and other data and information, and direct mail production), 3) "Marketing Credits" and 4) Turn Down Kickbacks.

**Referring Cash**

26.     Genuine Title paid Referring Cash directly to lenders' branch managers, loan officers, employees and/or agents in exchange for referrals of loans for settlement services.

27.     The Referring Cash kickbacks correlated to the volume of referrals to Genuine Title by the lenders' branch managers, loan officers, employees and/or agents.

28.     Genuine Title calculated and paid Referring Cash kickbacks monthly and the kickbacks paid in a given month were equal to a per unit payment for each referred loan closed by Genuine Title in the previous month.

29.     Referring Cash kickbacks were paid and received solely pursuant to the Referral Agreement and in furtherance of the Kickback Scheme and were not related to any legitimate services rendered by either Genuine Title or the person receiving the kickback.

**Free Marketing Materials**

30.    Genuine Title also paid kickbacks in the form of Free Marketing Materials.

31.    The Free Marketing Materials were paid by Genuine Title and/or by Competitive Advantage Media Group, LLC (hereinafter "CAM"), a company formed by Brandon Glickstein, Genuine Title's lead marketing and account representative.  CAM was created "to provide marketing services to businesses." *See* **Exhibit 2,** CAM SDAT Records**.**  The Resident Agent for CAM at the time of organization was Jonathan S. Bach, Esq., the in-house attorney for Genuine Title.   Additionally, the address for CAM was the same physical address of Genuine Title.   On or about May 13, 2013, CAM changed its Resident Agent and Resident Agent's address to Michael N. Mercurio at 8171 Maple Lawn Boulevard, Suite 200, Fulton, Maryland 20759. *See* **Exhibit 2.**

32.    CAM was formed in part to facilitate Genuine Title's payment of kickbacks and unearned fees in exchange for referring borrowers to Genuine Title.

33.    As part of and in furtherance of the Kickback Scheme, Genuine Title, either directly and/or through CAM, paid for marketing materials that were provided to mortgage branch managers, brokers, loan officers and/or other employees at lenders.

34.    These Free Marketing Materials included but were not limited to: the culling and selecting of the highest value leads to send mail that would most closely match the mortgage products and programs that the lender would be featuring, payment for sales leads, and payment for the inserting and folding of mail pieces and/or postage. **Exhibit 3,** 9/15/16 B. Glickstein Dep. at 16:7-18:18.

35.    Genuine Title provided Free Marketing Materials under the Referral Agreement whereby the receiving branch manager, broker, loan officer and/or other employee agreed to refer

all loans generated by the Free Marketing Materials to Genuine Title for settlement services. **Exhibit 3** at 43:4-13.

36.     The Free Marketing Materials kickbacks were paid and received solely pursuant to the Referral Agreement and in furtherance of the Kickback Scheme and were not related to any services rendered by Genuine Title, CAM and/or the person receiving the kickback.

**Marketing Credits**

37.     Genuine Title also paid kickbacks in the form of Marketing Credits applied to invoices for marketing services lenders purchased from CAM.  While in operation, CAM provided marketing services to primarily smaller and/or regional lenders and brokers. These marketing services included designing, writing and printing marketing letters and other solicitation materials sent out on behalf of the lender, culling and selecting the highest value leads to send mail that would most closely match the mortgage products and programs that the lender would be featuring, and the procurement of sales leads.  **Exhibit 3** at 16:7-18:18.

38.     As part of and in furtherance of the kickback scheme, Genuine Title entered into a Referral Agreement whereby a lender, broker, branch, or the loan officer (collectively, "Lender") would agree to refer loans to Genuine Title for settlement services and in return Genuine Title agreed to pay for marketing credits to be applied against that Lender's bill for services purchased from CAM.

39.     The Marketing Credit kickbacks were calculated monthly and the amount of the Marketing Credit in a given month was determined on a per unit amount for each referred loan closed by Genuine Title in the previous period.

40.     At smaller and regional banks, Referral Agreements for Marketing Credits were made with a branch manager who received credits equal to the number of loans referred by all loan officers in the branch. **Exhibit 3** at 33:15 to 35:20.

41.     CAM would invoice Genuine Title for and Genuine Title would pay CAM the amount of the Marketing Credit. CAM would then apply the Marketing Credit against the Lender's bill for CAM services.

42.     This multi-layered credit system was used by all parties to conceal, and did so conceal, the Kickback Scheme from borrowers, including Plaintiffs, Class Members, and regulators.

**"Turn Down" Kickbacks**

43.     During the time period of, and as a result of, the Kickback Scheme, Genuine Title had a large stable of various lenders who were referring borrowers to Genuine Title to perform closings and provide settlement services.  ("Referring Lenders").

44.     Genuine Title recognized that all of the various Referring Lenders had different lending criteria, meaning one Referring Lender may not be able to make a loan to a particular borrower, but that the same borrower might qualify for a refinance at a different Referring Lender ("Turn Down Opportunity").

45.     Three examples of where Genuine Title identified these Turn Down Opportunities was with Referring Lenders Bank of America, Wells Fargo, and PNC. *See* **Exhibit 4**, Nov. 4, 2010, Email from B. Glickstein to J. Ewing; **Exhibit 5**, Apr. 7, 2011, Email from B. Hill to T. Cohen, *et al.*

46.     Bank of America and Wells Fargo had at least one type of Turn Down Opportunity whereby borrowers who had loans originated or serviced by Bank of America could get

approved for a refinancing of that loan with another Bank of America loan even if their credit score or the amount of the loan as compared to the appraised value (commonly known as Loan to Value or LTV) did not meet the criteria required by other Referring Lenders.  *See* **Exhibit 4.**

47.     Genuine Title established Referral Agreements and kickbacks specifically related to Turn Down Opportunities whereby Genuine Title recruited Referring Lenders to send Turn Down Opportunities to other Referring Lenders in exchange for, and with the understanding that, Genuine Title would receive the title work.  *See* **Exhibit 6**, Dec. 9, 2010, Email from J. Hauck to B. Glickstein, A. Sanders.   The Referring Lenders who sent the Turn Down Opportunity ("Sending Lender") would receive either Referring Cash, Marketing Credits, and/or a combination thereof for every loan that was referred to, and closed with, Genuine Title.  *See, e.g.,* **Exhibit 7**, Mar. 24, 2011 Email from J. Hauck to B. Glickstein.

48.     In addition, the Referring Lender who received the Turn Down Opportunity ("Receiving Lender") received Kickbacks in the form of Turn Down Opportunities as well as Referring Cash, Marketing Credits, and/or a combination thereof for every loan that was referred to, and closed with, Genuine Title.

49.     Under this Turn Down Opportunity portion of the Kickback Scheme, the Receiving Lender obtained refinances that they would not otherwise have received during that timeframe in addition to kickbacks in the form of Referring Cash, Marketing Credit, and/or a combination thereof.  The Sending Lender received kickbacks in the form of Referring Cash, Marketing Credits, or a combination thereof it would otherwise not have received because they could not do the loan.  And Genuine Title received a referral of

another borrower for title and settlement services from the combined effort of the

Receiving Lender and the Sending Lender (collectively known as "Turn Down

Kickbacks").

50.     Neither the Receiving Lender nor the Sending Lender nor any of it agents, servants or

employees performed any settlement services in connection with their receipt of the

kickbacks outlined herein.

51.     The Referring Cash, Free Marketing Materials, Marketing Credits and Turn Down

Kickbacks were provided as a quid pro quo, and pursuant to and with an understanding

and agreement that the Referring Lenders' branch managers, loan officers, agents, and/or

employees receiving the Referring Cash, Free Marketing Materials, and Marketing

Credits would refer borrowers to Genuine Title for real estate title and settlement

services, including performing a title search and procuring title insurance.

52.     In some instances, when regulators began to investigate Genuine Title around October

2013, Genuine Title drafted sham and falsely backdated Title Services Agreements for

some branch managers and loan officers with the intent to disguise and conceal the

Kickbacks. However, the kickbacks were not provided in accordance with the fee

schedule in the Title Services Agreements and the branch managers, loan officers, agents,

and/or employees performed no services for Genuine Title.

53.     The sham Title Services Agreements were used to conceal, and did so conceal, the

Kickback Scheme from borrowers and regulators.

54.     Plaintiffs believe and therefore avers that the payment and receipt of Referring Cash, Free

Marketing Materials, Marketing Credits and/or Turn Down Kickbacks were not disclosed

on any line of the borrowers' GFEs, HUD-1s  and other loan documents in order to

conceal, and did in fact conceal, the Kickback Scheme from borrowers, including Plaintiffs, Class Members, and regulators.

55.   While Genuine Title would have preferred to compete by providing lower pricing of its title and settlement services to borrowers instead of paying kickbacks, the payment of kickbacks was the more effective way to increase Genuine Title's market share in the title and settlement services market, even though it was prohibited by law.  *See* **Exhibit 8,** J. Zukerberg 5/20/16 Aff. ¶ 6.

56.   Genuine Title has admitted that no title services were provided by any lender receiving kickbacks associated with the kickbacks, in whatever form those kickbacks were paid. *See id.*

57.   Genuine Title has admitted that borrowers, including Plaintiffs and Class Members, paid the cost of the kickbacks out of the title and settlement costs charged by Genuine Title and identified on their HUD-1s.  *See id.*

**FMC's Participation in the Kickback Scheme**

58.   Genuine Title's records indicate that from 2009 through 2014 FMC referred over 400 loans to Genuine Title for settlement services.

59.   Beginning in 2009, and, based upon Genuine Title and FMC's continuing pattern of practice, continuing until on or about May, 2014, licensed mortgage brokers employed by FMC received kickbacks from Genuine Title and/or CAM in exchange for referrals of FMC Borrowers to Genuine Title for settlement services, in violation of RESPA. **Exhibit 3** at 65:3-73:19.

60.   During the relevant time period, Referring Broker Angela Pobletts was employed by FMC as a mortgage broker and FMC loan origination branch manager.

61.     Under a Referring Agreement with Genuine Title, Pobletts received and accepted Referring Cash kickbacks paid by Genuine Title in exchange for the referral of FMC borrowers to Genuine Title.

62.     Pobletts in fact referred loans to Genuine Title under this Agreement and received kickbacks in the form of Referring Cash for these referrals.

63.     The Referring Cash kickbacks were paid by Genuine Title to Pobletts via MARC, LLC, a company created at least in part specifically to receive Referring Cash kickbacks.  *See* **Exhibit 9**, Certificate of Formation for MARC, LLC; *see* **Exhibit 10**, Genuine Title checks to MARC, LLC.

64.     This Referring Agreement with Genuine Title was in place the entire time Pobletts, and her FMC branch, were referring borrowers to Genuine Title.

65.     During the relevant time period, Referring Broker John Hauck was employed by FMC as a mortgage broker and FMC loan origination branch manager. **Exhibit 11,** Nov. 10, 2010 Email from J. Hauck to B. Glickstein and A. Sanders.

66.     Under a referring agreement with Genuine Title, Referring Broker Hauck received and accepted Marketing Credits kickbacks paid by Genuine Title in exchange for the referral of FMC borrowers to Genuine Title.

67.     Referring Broker Hauck in fact referred loans to Genuine Title under this Referral Agreement and received and accepted kickbacks in the form of Marketing Credits for these referrals.   **Exhibit 12**, Hauck Marketing Credit Invoices.

68.     This agreement with Genuine Title was in place the entire time Referring Broker Hauck, and his FMC branch, were referring loans to Genuine Title.

69.   During the relevant time period, Referring Brokers Brandon Hill and Bryan McCrea were employed by FMC as mortgage brokers and FMC loan origination branch managers.

70.   Under a Referring Agreement with Genuine Title, Referring Brokers Hill and McCrea received and accepted Marketing Credit kickbacks paid by Genuine Title in exchange for the referral of FMC borrowers to Genuine Title. **Exhibit 3** at 67:1-68:6.

71.   Hill and McCrea in fact referred loans to Genuine Title under this Agreement and received kickbacks in the form of Marketing Credits for these referrals. **Exhibit 13,** Hill and McCrea Marketing Credit Invoices**.**

72.   This agreement with Genuine Title was in place the entire time Hill and McCrea were referring borrowers to Genuine Title.  *See* **Exhibit 3** at 67:1-68:6**.**

73.   During the relevant time period, Referring Broker Megan Foley was employed by FMC as a mortgage broker.

74.   Under a Referring Agreement with Genuine Title, Referring Broker Foley received and accepted Referring Cash kickbacks paid by Genuine Title in exchange for the referral of FMC borrowers to Genuine Title.

75.   Referring Broker Foley in fact referred loans to Genuine Title under this Agreement and received kickbacks in the form of Referring Cash for these referrals. **Exhibit 14,** Genuine Title Checks to M. Foley.

76.   This agreement with Genuine Title was in place the entire time Foley was referring borrowers to Genuine Title.

77.   During the relevant time period, Referring Broker Frank Bisesi was employed by FMC as a mortgage broker and FMC loan origination branch manager.

78.  Under a Referring Agreement with Genuine Title, Bisesi received and accepted Referring Cash kickbacks paid by Genuine Title by and through CAM in exchange for the referral of FMC borrowers to Genuine Title. **Exhibit 3** at 70:11-20, 73:13-19.

79.  Bisesi in fact referred loans to Genuine Title under this Agreement and received kickbacks in the form of Referring Cash for these referrals. **Exhibit 15,** CAM checks to F. Bisesi.

80.  This agreement with Genuine Title was in place the entire time Bisesi was referring borrowers to Genuine Title.  **Exhibit 3** at 70:11-20, 73:13-19.

81.  Plaintiffs believe and therefore avers that, based upon Genuine Title's and FMC's continuing pattern of practice, other currently known or unknown Referring Brokers and FMC loan origination branch managers employed by FMC participated in the Kickback Scheme.

82.  Plaintiffs additionally believe and therefore avers that, based upon Genuine Title's and FMC's continuing pattern of practice, Genuine Title provided, and currently known and unknown Referring Brokers and FMC loan origination branch managers employed by FMC received, other things of value in exchange for referring borrowers to Genuine Title.

83.  Genuine Title has admitted that no title services were provided by FMC and/or its Referring Brokers, agents, and/or employees associated with the receipt of the kickbacks. *See* **Exhibit 8**, ¶ 6.

84.  The payment by Genuine Title and acceptance by FMC of the kickbacks were solely for the referral of borrowers to Genuine Title. *See Id.*

85.     Plaintiffs were charged for settlement services related to their federally-related mortgage by Genuine Title while FMC was engaging in the Kickback Scheme. *See id.*

86.     Plaintiffs and Class Members paid more for their settlement services because FMC's Referring Brokers performed no services in exchange for the kickbacks paid and kickbacks were paid instead of lower charges to the consumers. *See id.*

87.     As a result of the Kickback Scheme, Plaintiffs and Class Members were deprived of kickback-free settlement services and impartial and fair competition, as required by 12 U.S.C. § 2607.

<u>FACTUAL ALLEGATIONS RELATING TO THE</u>
<u>INDIVIDUAL CLASS REPRESENTATIVES</u>

88.     In or about 2011, Plaintiff John Ryman and his wife, Donna Ryman, obtained a residential mortgage from FMC through FMC Referring Broker and Loan Origination Branch Manager Frank Bisesi in relation to the refinancing of their residential real property in Newport News, Warwick County, Virginia.

89.     Bisesi referred Ryman to Genuine Title for title and settlement services.  On the basis of this referral, Ryman used Genuine Title for title and settlement services and settled on or about July 12, 2011.  Ryman paid Genuine Title for title and settlement services.

90.     Bisesi referred Ryman to Genuine Title for title and settlement services pursuant to an agreement with Genuine Title for Referring Cash as quid pro quo for referrals to Genuine Title and did so receive Referring Cash from Genuine Title.

91.     Genuine Title by and through CAM paid Bisesi Referring Cash following the settlement of Ryman's loan.  *See* **Exhibit 15,** check No. 441.  A portion of this Referring Cash payment represents the kickback that is attributable to the referral of Ryman's loan to Genuine Title.

92.     Ryman paid Genuine Title for those title and settlement services.  A portion of that payment was illegally split and shared with FMC through the payment of the illegal kickbacks to Frank Bisesi.

93.     In or about 2011, Plaintiffs Bobby and Thelma Thomas (collectively, "the Thomases") obtained a residential mortgage from FMC through FMC Referring Broker Ernest "Steven" Greathouse in relation to the refinancing of their residential real property in Baltimore, Baltimore City, Maryland.

94.     FMC Referring Broker Greathouse was employed by FMC as a mortgage broker in the FMC loan origination branch managed by FMC mortgage broker John Hauck.

95.     Greathouse referred the Thomases to Genuine Title for title and settlement services.  On the basis of this referral, the Thomases used Genuine Title for title and settlement services and settled on or about March 16, 2011.  The Thomases paid Genuine Title for title and settlement services.

96.     Greathouse referred the Thomases to Genuine Title for title and settlement services pursuant to a Referring Agreement with Genuine Title for Marketing Credit kickbacks as quid pro quo for referrals to Genuine Title and did so receive kickbacks from Genuine Title.

97.     Genuine Title, by and through CAM, paid Marketing Kickbacks to Greathouse's FMC Branch Manager Hauck following the settlement of the Thomases loan.  *See* **Exhibit 12,** 3/30/2011 Invoices**.**  A portion of the Marketing Credit paid by Genuine Title to CAM represents the kickback that is attributable to the referral of the Thomases' loan to Genuine Title.

98.   The Thomases paid Genuine Title for those title and settlement services.  A portion of that payment was illegally split and shared with FMC through the payment of the illegal kickbacks.

99.   In or about 2011, Plaintiff Kimberly Thomas obtained a residential mortgage from FMC through FMC Referring Broker and Loan Origination Branch Manager John Hauck in relation to the refinancing of her residential real property in Upper Marlboro, Prince Georges County, Maryland.

100.  Hauck referred Kimberly Thomas to Genuine Title for title and settlement services.  On the basis of this referral, Kimberly Thomas used Genuine Title for title and settlement services and settled on or about March 16, 2011.  Kimberly Thomas paid Genuine Title for title and settlement services.

101.  Hauck referred Kimberly Thomas to Genuine Title for title and settlement services pursuant to a Referring Agreement with Genuine Title for Marketing Credit kickbacks as quid pro quo for referrals to Genuine Title and did so receive kickbacks from Genuine Title.

102.  Genuine Title by and through CAM paid Marketing Kickbacks to Hauck following the settlement of the Thomases loan.  *See* **Exhibit 12** at 03/30/2011 Invoices**.**  A portion of the Marketing Credit paid by Genuine Title represents the kickback that is attributable to the referral of Kimberly Thomas' loan to Genuine Title.

103.  Kimberly Thomas paid Genuine Title for those title and settlement services.  A portion of that payment was illegally split and shared with FMC through the payment of the illegal kickbacks to FMC Referring Broker and Branch Manager Hauck.

104.   As a pattern of practice, and as a precondition to closing a loan or refinance, FMC required borrowers to fully participate in the loan transaction, including receiving and signing government-required loan documents before and at a loan closing.

105.   Plaintiffs fully participated in their respective loan transactions as evidenced by each Plaintiff's loan funding - the Ryman loan on or about July 18, 2011, the Thomases' loan on or about March 21, 2011, and Kimberly Thomas' loan on or about November 29, 2010.

106.   Under federal law, FMC is required to provide each borrower with a Good Faith Estimate ("GFE") within three days of taking a loan application. On the GFE, the loan officer or broker "must state here all charges that all loan originators involved in this transaction will receive." 12 C.F.R. 1024, App'x C – Instructions for Completing Good Faith Estimate (GFE) Form.

107.   As a pattern of practice, and in an effort to conceal its fraud, FMC did not report on Plaintiffs' or on any FMC borrower's GFE the kickback received from Genuine Title under the Referring Agreement, despite the fact that the kickbacks were charged to and paid by the borrowers and received and accepted by FMC.

108.   As a result of this act of concealment, no FMC borrower, including Plaintiffs, received a GFE associated with an FMC originated or brokered loan reflecting a payment of any kind from Genuine Title to FMC. Therefore, FMC borrowers, including Plaintiffs, did not know and could not have known of the kickback, or the Kickback Scheme, before the closing of their respective loan.

109.   RESPA requires that each borrower receive a HUD-1 Settlement Statement. 12 U.S.C. § 2603(a).  The purpose of the HUD-1 statement is to, among other things, "conspicuously

and clearly itemize all charges imposed upon the borrower. . . ."  *Id.*  Under regulations imposed by the federal government, "[t]he loan originator must transmit to the settlement agent all information necessary to complete the HUD-1 or HUD-1A."   12 C.F.R. § 1024.8(b).  As such, FMC was responsible for all information included in the HUD-1 that was then generated by Genuine Title.

110.   Despite being required by law to report the amounts paid and received as a result of the transaction, FMC and Genuine Title omitted the fact and amount of the kickbacks from all lines and sections of Plaintiffs' HUD-1 settlement statements and all other required loan documents in an effort to intentionally conceal the kickbacks from Plaintiffs, and did so conceal the kickbacks from Plaintiffs.

111.   As a pattern of practice, and in an effort to conceal its fraud, FMC did not provide to Genuine Title for inclusion in the HUD-1 any information necessary to itemize the kickback payments made to FMC by Genuine Title under the Referring Agreement, despite the fact that the kickbacks were charged to and paid by the borrowers.

112.   As a pattern of practice and in an effort to conceal its fraud, Genuine Title purposefully did not produce a HUD-1 Settlement Statement that itemized the kickbacks paid to and received and accepted by FMC under the Referring Agreement, despite the fact that the kickbacks were charged to and paid by the borrowers.  *See* **Exhibit 3** at 159:15-160:1.

113.   As a result of these acts of concealment, no FMC borrower, including Plaintiffs, received a HUD-1 statement reflecting a payment of any kind from Genuine Title to FMC, and did not know and could not have known of the kickback, or the Kickback Scheme, at or after the closing of their loan.

114.   Because no payment from Genuine Title to FMC was disclosed on the HUD-1, Plaintiffs did not have, and could not have had, any knowledge of the kickbacks during or after the settlement on their mortgage loan, or that a portion of their payment to Genuine Title for title and settlement services was illegally split and shared with FMC through the payment of the illegal kickbacks to FMC brokers and loan origination branch managers.

115.   As a direct and proximate cause of the actions of FMC, Plaintiffs and other Class Members were deprived of impartial and fair competition between settlement service providers in violation of RESPA and paid more for said settlement services, in addition to other harms.

## CLASS ACTION ALLEGATIONS

116.   The allegations in the above stated paragraphs are incorporated by reference as if fully restated herein.

117.   Plaintiff brings this action on behalf of herself and all other similarly situated individuals pursuant to Fed. R. Civ. P. 23, and the alleged class is defined as follows:

> All individuals in the United States who were borrowers on a federally related mortgage loan (as defined under the Real Estate Settlement Procedures Act, 12 U.S.C. § 2602) originated or brokered by First Mortgage Corporation for which Genuine Title provided a settlement service, as identified in Section 1100 on the HUD-1, between January 1, 2009, and December 31, 2014. Exempted from this class is any person who, during the period of January 1, 2009 through December 31, 2014, was an employee, officer, member and/or agent of First Mortagage Corporation, Health One Credit Union, Genuine Title LLC, Brandon Glickstein, Inc., Competitive Advantage Media Group LLC, and/or Dog Days Marketing LLC.

118.   There are questions of law and fact common to the claims of each and all members of the Class. These common questions include, but are not limited to:

a.    Whether FMC and its employees and/or agents received unearned fees and illegal kickbacks from Genuine Title and/or CAM for the referral of business to Genuine Title;

b.    Whether payments to FMC and its employees and/or agents violated RESPA;

c.    Whether Plaintiffs and Class Members were forced to pay more for said settlement services;

d.    Whether FMC actively concealed the Kickback Scheme to avoid detection by Plaintiffs and Class Members;

e.    Whether Plaintiffs and the Class are entitled to treble damages under RESPA;

f.    Whether Plaintiffs and the Class are entitled to attorneys' fees and expenses under RESPA;

g.    Whether Genuine Title failed to disclose and concealed from Plaintiffs and Class Members that Genuine Title and/or CAM was participating with banks, referring branch managers, loan officers, employees and/or agents and failed to disclose and concealed, among other things, their coordinated business arrangements and/or relationships; and

h.    Whether despite exercising reasonable due diligence, Plaintiffs and Class Members did not and could not have learned of the illegal kickbacks until contacted by counsel.

119.   These common issues of law and fact, and RESPA's statutory measure of damages, predominate over any question affecting only individual Class members.

120.   Due to Genuine Title and FMC's omission of kickbacks from any line and section on borrowers' GFEs, HUD-1s and other loan documents Plaintiffs and Class Members did

not and could not have known of the kickbacks or the Kickback Scheme before, at or after the time of settlement of their residential mortgage loans.

121.   Due to Genuine Title and FMC's efforts to conceal the kickbacks from Plaintiffs, Class Members, and regulators through Genuine Title's payment of the kickbacks to sham LLCs,  and through a multi-layered marketing credit system, Plaintiffs did not, and could not have known about the Kickback Scheme after the settlement of their residential mortgage loan.

122.   Plaintiffs acted reasonably and diligently. Plaintiffs did not and could not have known about the Kickback Scheme until contacted by undersigned counsel at the earliest on or about March 10, 2017.

123.   Plaintiffs' transactions and the course of events thereafter exemplify the working of the Kickback Scheme, and are typical of the transactions involving all members of the proposed class.

124.   Plaintiffs' claims are typical of the claims or defenses of the respective Class Members.

125.   Plaintiffs' damages for the RESPA violations are subject to a statutory measure of damages equal to three times the amount of any charges paid for settlement services, as set forth in 12 U.S.C. §2607(d)(2). This statutory measure of damages is common to all Class members.

126.   Plaintiffs will fairly and adequately protect the interests of the Class. The interests of the named Plaintiffs and all other members of the Class are identical.

127.   Plaintiffs' counsel has substantial experience in complex litigation and class action proceedings and will adequately represent the Class's interests. Plaintiffs' counsel have

been found to be adequate class counsel in related cases. *See Fangman v. Genuine Title*, 1:14-cv-00081-RDB, 2016 U.S. Dist. LEXIS 154582, at *36 (D. Md. Nov. 8, 2016).

128.  The Class consists, upon information and belief, of over four hundred borrowers, and thus is so numerous that joinder of all members is impracticable.

129.  Separate actions by individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the class that would establish incompatible standards of conduct for FMC.

130.  This action entails questions of law and fact common to Class Members that predominate over any questions affecting only individual Plaintiffs, and, therefore, a class action is superior to other available methods of fair and efficient adjudication of this litigation.

131.  Most members of the Class are unaware of their rights to prosecute a claim against Defendant.

132.  No member of the Class has a substantial interest in individually controlling the prosecution of a separate action, but if he or she does, he or she may exclude himself or herself from the class upon the receipt of notice under Fed. R. Civ. P. 23(c).

## FACTUAL ALLEGATIONS SUPPORTING PIERCING
## THE CORPORATE VEIL BETWEEN FMC AND HEALTH ONE

133.  Health One was chartered in 1957 and serving primarily employees of Blue Cross Blue Shield and persons residing, working, worshipping, volunteering and attending school in Michigan's Macon, Oakland, Washtenaw and Wayne counties.

134.  Under Michigan law during the relevant time period, Health One was permitted to provide residential mortgages to only Health One members – between 4,000 and 6,000 people during the relevant time period. MCL 490.401(1)(i) (2003).   Health One was not permitted to provide residential mortgage loans to the millions of persons who were not a

Health One member, and was also prohibited from brokering or selling mortgage products for other lenders.

135. Health One established FMC in 1996 for the purpose of profiting from the brokering and sale of residential mortgage loans to the millions of borrowers who were not Health One members. FMC was created and maintained for primary purpose of benefitting Health One.

136. For the purpose of using Health One's Title II lending authorization – permitting FMC to broker, sell and service government insured loan products – Health One represented to HUD, and others, that FMC was in fact only "Health One d/b/a First Mortgage Corporation."  Health One made this representation for each of six (6) FMC loan origination branches. **Exhibit 16**, HUD Neighborhood Watch Title II Reports. Similarly, in FMCs listing with the National Mortgage Licensing System (NMLS), the Health One officers listed as the email contact for FMC, and the contact phone numbers listed for FMC are in fact phone numbers for Health One.  *See* http://www.nmlsconsumeraccess.org/EntityDetails.aspx/COMPANY/3722#RegulatoryActions.

137. Health One incorporated FMC under Michigan law in March, 1996. Health One was the sole incorporator and shareholder of FMC.  Health One's President James Perna ("Perna") signed FMC's Articles of Incorporation and was FMC's registered agent. **Exhibit 17**, FMC Art. of Incorp.  Perna remained FMC's registered agent through FMC's entire existence, and Health One's Bricktown branch at 600 E Lafayette Boulevard in Detroit was identified as FMC's "registered office." **Exhibit 18,** FMC Annual Reports.

138.  More than simply the sole FMC stockholder, Health One's directors, officers and other employees dominated FMC's management.

139.  Health One's President Perna played an especially dominant role at FMC.  During the time period of the Kickback Scheme, Perna signed all of FMC's Annual Reports as an FMC "authorized officer or agent."  Perna describes himself alternatively as  FMC's "CEO" or "Treasurer."  *See* **Exhibit 18.**

140.  Perna filed FMC's  Maryland Foreign Corporation Qualification in Maryland and identified himself as FMC's "President or Vice President." *See* **Exhibit 1**.

141.  In a regulatory action against FMC for brokering loans at unregistered loan production offices in Texas, Perna negotiated and signed a consent order with the state of Texas as FMC's "qualifying person." **Exhibit 19**,  Agreed Order to Cease and Desist and Pay Administrative  Penalty.  Cease and Desist Order and Payment of Civil Penalty.

142.  Charles Smith, a Health One Vice President and long-time Chairman of Health One's board of directors, also played a dominant role in FMC's administration and management.  A 2011 Management Agreement between FMC, Health One and RBR Capital Group, Inc. ("RBR"), a company Health One hired to manage FMC's loan origination branches, named "the current officers of FMC."  Smith was named as FMC's President and Perna as FMC's  "Secretary/Treasurer."  No other officers were listed leaving FMC's officers and management dominated exclusively by Health One officers. **Exhibit 20,** Management Agreement, Art. 1, §1.01.

143.  Perna signed the 2011 Management Agreement on behalf of FMC. *Id.*.

144.  In subsequent amendments and extensions to that Agreement, Perna signed on behalf of FMC and Health One.  **Exhibit 21,** Amendments to Management Agreement.

145.  Health One, by and through Perna and Smith, also dominated FMC's board of directors. The 2011 Management Agreement described FMC as having a three person board of directors, with Smith and Perna serving as two out of the three directors. **Exhibit 20** at Art. 1, §1.01 .  During the same time period, Health One reported to its federal regulator that Smith was the Chairman of Health One's Board and Perna was described as Health One's "manager or CEO, Board of Directors."  **Exhibit 22,** Health One March, 2012, NCUA Profile Report**.**

146.   The 2011 Management Agreement states the third FMC board seat was "vacant," leaving the FMC board of directors with a non-functioning director and dominated exclusively by Health One directors and officers. **Exhibit 20** at Art. 1, §1.01.

147.  Health One dominated the management of FMC.  Health One selected and hired the management company to manage FMC loan origination branches, and dictated the terms of the management agreements. The 2011 Management Agreement refers to an agreement with a prior management company, and Plaintiffs believe, and therefore aver, that the terms of all of that management agreement are substantially similar to the terms of the 2011 Management Agreement. *See Id.* at Art. 7, §7.14(b)..

148.  Those management agreements gave Health One, by and through Perna and Smith's domination and control of FMC's board of directors, the authority to control FMC's operations and day-to-day affairs. Under the Management Agreement, the Health One selected manager of FMC was "subject to the direction and control of the Officers and Board of Directors of the Corporation," which was dominated exclusively by Perna and Smith. The Manager was not permitted to attend FMC Board of Directors Meeting except by invitation, and was specifically denied any voting rights. *See id.*

149.   The Manager had "no power" to bind FMC to any contract, and FMC, by and through its
       Health One dominated Board of Directors, was required to provide its written consent to
       any FMC "cost or expense."  *See Id.* at Art. 1, §1.02.

150.   Under the Management Agreement, Perna and Smith had the sole authority to establish
       FMC's policies and procedures applicable to FMC loan origination branches, and
       approve the establishment of any FMC loan origination branch. *See id.*

151.   FMC's pricing, fees and compensation for its loan officers, branch managers and other
       employees were all under the authority and control of FMC's Board of Directors, and,
       therefore, Perna and Smith. *See id.*

152.   All revenue generated by FMC's business activities was required to be deposited in an
       account at Health One. *See id.*

153.   Health One regularly siphoned funds from FMC taking monthly "bonuses,"
       "management fees," "reserves," and "repayments" out of FMC's revenues. The amounts
       Health One siphoned from FMC regularly exceeded the revenues it permitted FMC to
       retain. **Exhibit 23**, FMC Income Statement Calculations.

154.   The amounts Health One siphoned from FMC were to be paid to Health One before any
       other expense.  **Exhibit 20** at Art. III, §3.01.

155.   NCUA Call Reports reflect the enormous sums of money Health One siphoned from
       FMC.  In its Call Reports, Health One reported siphoning amounts ranging from tens of
       thousands of dollars to over $7 million in the quarter ending June, 2011. **Exhibit 24**,
       March, 2010 – June, 2011, Call Reports Excerpts.

156.   In addition to siphoning millions of dollars from FMC, Health One maintained FMC in a
       state of gross undercapitalization such that Health One had to make regular loans to FMC

so it could continue to operate.  After siphoning more than $10 million from FMC in the first quarters of 2011,   in September, 2011, Health One loaned FMC $167,000 which Health One reported to the NCUA constituted all of FMC's assets.  **Exhibit 25**, Sept. 2011 Health One Call Report.

157.   Similarly, in March, 2012, Health One made an additional loan to FMC bringing Health One's investment in FMC to $326,502, which Health One reported to the NCUA was all of FMC's assets. **Exhibit 26**, March, 2012, Health One Call Report.

158.    A year later, in March, 2013, Health One was forced to make another loan to FMC of $268,401 which, together with Health One's incorporation capital of $125,000, was all of FMC's reported assets. **Exhibit 27**, March, 2013, Health One Call Report.

159.    In September, 2013, Health One loaned FMC $140,000 on a reported FMC loss of $424,364. **Exhibit 28**, Sept., 2013, Health One Call Report.

160.   In December, 2013, Health One loaned FMC an additional $19,469 on a reported FMC loss of $365,472 and capitalization of just $81,019. **Exhibit 29,** Dec. 2013 Health One Call Report.

161.   Health One and FMC funds were also intermingled. Health One required FMC to maintain a corporate operating account at Health One and to deposit all revenues generated from FMC activities in the Health One account.  **Exhibit 20** at Art. 1, §1.02.

162.   FMC additionally failed to follow corporate formalities. In 2014, after seizing and auditing Health One's records in conservatorship proceedings, the Michigan Department of Insurance and Financial Services ("DIFS"), Health One's Michigan regulator, concluded that Health One and FMC "never had two separate boards."  **Exhibit 30,**

30

Chad Sewelski, <u>Macomb County Candidate Perna Ousted By State as Credit Union CEO,</u> The Macomb Daily, June 7, 2014 at A1.

163.   In addition to failing to maintain separate boards, FMC did not prepare regular financial audits and did not prepare individual corporate financial statements.  Instead, Health One prepared consolidated financial statements showing Health One and FMC as one entity with intermingled financial affairs.

164.   Health One blamed FMC for Health One's insolvency and "unsafe and unsound condition" that caused Health One's conservatorship, receivership, liquidation and sale to New England Federal.  Perna, Health One's President, blamed "…all of the credit union's financial problems" on the "activities of a revamped company subsidiary that did business as a mortgage broker service." Perna stated: "The credit union got involved with this new company and they lost their shirt." **Exhibit 30.**

165.   Based on these and other facts, Health One was the alter ego of FMC such that it is appropriate to pierce the corporate veil between FMC and Health One for the purposes of establishing personal jurisdiction over Health One and to hold Health One responsible for the acts and omissions of FMC and its employees and/or agents.

**FACTUAL ALLEGATIONS SUPPORTING
NEW ENGLAND FEDERAL'S SUCCESSOR LIABILITY**

166.   New England Federal did not acquire Health One in a bona fide arms length transaction.

167.   On May 16, 2014, Health One was placed in conservatorship by the Director of the Michigan Department of Insurance and Financial Services ("DIFS") because it was found to be in an "unsound and unsafe condition."  The NCUA was appointed conservator of Health One, and all of its assets including FMC, and seized all of Health One and FMC's corporate records.

168.   As conservator, the NCUA concluded that "because of previously unrecorded obligations" Health One was in "imminent danger of insolvency."  The insolvency was caused by FMC loans which had a delinquency rate of more than 10%. Health One was required to repurchase, or could not sell, these loans to FMC's correspondent lenders because these loans were written in violation of these correspondent lenders underwriting requirements. These are the same loans FMC Referring Brokers and Branch Managers received and accepted kickbacks for in furtherance of the Kickback Scheme. **Exhibit 20** at Art. 7, §7.14(c), **Exhibit 31,** 12/8/2014 DIFS Memo. and Rec.

169.   The NCUA recommended that a receiver be appointed for Health One.

170.   As conservator the NCUA negotiated a purchase and assumption of Health One by New England Federal Credit Union.

171.   The Purchase & Assumption Agreement is not public, and, to date, DIFS and the NCUA have failed and refused to produce a copy of the Purchase & Assumption Agreement under a valid Freedom of Information Act request by undersigned counsel.

172.   FMC's residential mortgage lending website remains operational and continues to offer residential mortgage products. Plaintiffs believe, and therefore aver, that this website is controlled and maintained by New England Federal and that under the Purchase & Assumption New England Federal expressly or impliedly assumed the assets and liabilities of Health One, including FMC.

173.   On December 12, 2014, on DIFS' petition, the NCUA was appointed as the receiver and liquidating agent for Health One.  New England Federal's purchase and assumption of Health One was concluded the same day.   Health One operations as an independent

credit union ceased the same day.  **Exhibit 32,** Dec. 12, 2014, DIFS Press Release;

**Exhibit 33,** Dec. 12, 2014, NCUA Press Release.

174.    There is an identity of ownership between Health One and New England Federal. As of

the effective date of the Purchase & Assumption, all Health One shareholders and

members automatically became New England Federal shareholders and members. *See id.*

175.    New England Federal assumed the assets and business operations of Health One

sufficient for uninterrupted continuation of Health One's normal and general business

operations, including those assets necessary to continue operation of Health One's branch

banking locations, check clearing operations, insured deposits, the administration of

outstanding member loans including residential mortgage loans, and member access to

bank funds by check writing, ATM, debit and credit card.  Under the Purchase &

Assumption, Health One members were guaranteed, and experienced, "no interruption in

services." *See id.*

176.    Therefore, in addition to and in the alternative to New England Federal's express or

implied assumption of Health One assets and liabilities, the Purchase & Assumption

constitutes a de facto merger between Health One and New England Federal subjecting

New England Federal to successor liability.

177.    As of the Purchase & Assumption, Health One was inactivated as a credit union and

exists only as a division of New England Federal.

178.    New England Federal has continued all of Health One's business operations and holds

itself out to the public as continuing Health One.  New England Federal retained Health

One's branch and ATM locations and continues to operate these branches as Health One

branded locations. These Health One branded locations offer the same banking and

financial services as before the Purchase & Assumption and these services are branded as Health One services. *See* http://www.healthonecu.com/healthone/ locations.html.

179.   New England Federal continues and maintains Health One's website at the same internet address. The website is a Health One branded website, in which Health One is described as continuing as a "division of New England Federal Credit Union." https://www.healthonecu.com/healthone.html. Additionally, they trace their existence and stability back to the beginning of Health One in 1956. http://www.healthonecu.com/ healthone/about-healthone.html.

180.   New England Federal maintains a Health One Facebook page and Twitter account with the account name "@HealthOneCU".  *See* https://www.facebook.com/ HealthOneCU/.

181.   Therefore, as there is common identity of stockholders, a continuation of business operations and locations, and the survival of a single entity as the result of a less than arms length transaction, in addition to and in the alternative to other theories of liability, New England Federal is subject to successor liability for the obligations and liabilities of FMC as a mere continuation of FMC's alter ego, Health One.

## COUNT I
## Violation of the Real Estate Settlement Procedures Act (RESPA), 12 U.S.C. § 2607(a) and (b)

182.   Plaintiffs incorporate the above stated paragraphs as if restated herein.

183.   All transactions at issue in the instant complaint are incident to or part of real estate settlement services involving federally related mortgage loans and thereby are subject to the provisions of RESPA, 12 U.S.C. § 2601, *et seq.*

184.   At all relevant times, Genuine Title was subject to the provisions of RESPA, 12 U.S.C. § 2601, *et. seq.*

185. As a lender and/or broker and/or servicer of federally related mortgage loans, FMC is subject to the provisions of RESPA, 12 U.S.C. § 2601, *et seq.*

186. Genuine Title and/or CAM paid FMC kickbacks and/or things of value in exchange for referrals of business to Genuine Title in violation of RESPA, 12. U.S.C. § 2607(a) and (b).

187. FMC by and through its brokers, loan officers, employees and/or agents received things of value for referrals of business as part of real estate settlement services provided to Plaintiffs and Class Members, in violation of RESPA, 12 U.S.C. § 2607(a) and (b).

188. All loans referred to Genuine Title as part of the Kickback Scheme were secured by first or subordinate liens on residential real property and were made in whole or in part by FMC and/or its affiliates whose deposits or accounts are insured by the Federal Government and/or who are regulated by an agency of the Federal Government.

189. The payment and/or arranging of payment of kickbacks to FMC by Genuine Title and/or CAM and FMC's receipt thereof constitute a violation of § 8(a) of RESPA, which prohibits the payment of referral fees or kickbacks pursuant to an agreement in connection with the origination or brokering of federally related mortgage loans.

190. The kickbacks paid by Genuine Title and/or CAM to FMC were also made solely for the purpose of Genuine Title receiving referrals and no services were actually performed by FMC in connection with the receipt of these payments and/or things of value, in violation of 12 U.S.C. § 2607(b), which prohibits the splitting of fees in connection with the origination of federal related mortgage loans.

191. Genuine Title and FMC fraudulently, actively concealed the kickbacks paid to Referring Brokers from Plaintiffs and Class Members by refusing to list the kickbacks on any line

of Plaintiffs' and Class Members' HUD-1 settlement statements and settlement documents, failed and refused to disclose their coordinated business arrangement and by engaging in an elaborate payment scheme, including the use of sham LLCs, to conceal the illegal kickbacks.

192.   Despite acting reasonably and exercising due diligence, Plaintiffs and Class Members did not and could not have known about the Kickback Scheme until contacted by undersigned counsel.

193.   As a direct and proximate cause of Genuine Title's actions, Plaintiffs and Class Members used Genuine Title for title and settlement services, paid for said services and were deprived of impartial and fair competition and the costs paid by Plaintiffs and Class Members to Genuine Title for settlement services would have been lower.

WHEREFORE:

a.   Plaintiffs respectfully demand this Court to certify this class action pursuant to Federal Rule of Civil Procedure 23 and set this matter for trial; and

b.   Demand judgment for Plaintiffs and Class Members against FMC and award Plaintiffs and Class Members an amount equal to:

1.   Treble damages for settlement services charged by Genuine Title, including, but not limited to, title insurance premiums, in an amount equal to three times the amount of any charge paid for such settlement services, pursuant to 12 U.S.C. § 2607(d)(2);

2.   Reasonable attorneys' fees, interest and costs pursuant to 12 U.S.C. § 2607(d)(5); and

3.   Such other and further relief as this Court deems proper.

Respectfully submitted,

_____/s/_____          _____/s/_____
Timothy F. Maloney, Esq. #03381      Michael Paul Smith, Esq. #23685
Veronica B. Nannis, Esq. #15679      Melissa L. English, Esq. #19864
Megan Benevento, Esq. #19883         Sarah A. Zadrozny, Esq. #13911
Joseph, Greenwald & Laake            Smith, Gildea & Schmidt, LLC
6404 Ivy Lane, Suite 400             600 Washington Avenue, Suite 200
Greenbelt, Maryland 20770            Towson, MD 21202
(301) 220-2200 / (301) 220-1214 (fax)   (410) 821-0070 / (410) 821-0071 (fax)
Email: tmaloney@jgllaw.com           Email: mpsmith@sgs-law.com
vnannis@jgllaw.com                   menglish@sgs-law.com
mbenevento@jgllaw.com                szadrozny@sgs-law.com
*Co-Counsel for Plaintiff and Class Members*   *Counsel for Plaintiff and Class Members*

## **PRAYER FOR JURY TRIAL**

Plaintiff and Class Members hereby request a trial by jury on the foregoing Class Action

Complaint.

_____/s/_____          _____/s/_____
Timothy F. Maloney, Esq. #03381      Michael Paul Smith, Esq. #23685
Veronica B. Nannis, Esq. #15679      Melissa L. English, Esq. #19864
Megan Benevento, Esq. #19883         Sarah A. Zadrozny, Esq. #13911
Joseph, Greenwald & Laake            Smith, Gildea & Schmidt, LLC
6404 Ivy Lane, Suite 400             600 Washington Avenue, Suite 200
Greenbelt, Maryland 20770            Towson, MD 21202
(301) 220-2200 / (301) 220-1214 (fax)   (410) 821-0070 / (410) 821-0071 (fax)
Email: tmaloney@jgllaw.com           Email: mpsmith@sgs-law.com
vnannis@jgllaw.com                   menglish@sgs-law.com
mbenevento@jgllaw.com                szadrozny@sgs-law.com
*Co-Counsel for Plaintiff and Class Members*   *Counsel for Plaintiff and Class Members*